| | |
|---|---|
| 1 | Laurie Edelstein (Bar No. 164466) |
| | Seth R. Sias (Bar No. 260674) |
| 2 | STEPTOE & JOHNSON LLP |
| | 1891 Page Mill Road, Suite 200 |
| 3 | Palo Alto, California 94304 |
| | Telephone: (650) 687-9500 |
| 4 | Facsimile: (650) 687-9499 |
| | ledelstein@steptoe.com |
| 5 | ssias@steptoe.com |

Michael Baratz (application for *pro hac vice* admission submitted concurrently)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
Telephone: (202) 429-3000
Facsimile: (202) 429-3902
mbaratz@steptoe.com

*Attorneys for Plaintiffs iFinex Inc., BFXNA Inc., BFXWW Inc., and Tether Limited*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| iFINEX INC., BFXNA INC., BFXWW INC, and TETHER LIMITED, <br><br> Plaintiffs, <br><br> v. <br><br> WELLS FARGO & COMPANY and WELLS FARGO BANK, N.A., <br><br> Defendants. | No. 17 Civ. 1882 <br><br> **PLAINTIFFS'** ***EX PARTE*** **APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE** <br><br> Fed. R. Civ. P. 65 and Local Rule 65-1 |

STEPTOE & JOHNSON LLP
1891 Page Mill Road, Suite 200
Palo Alto, CA 94304

# APPLICATION FOR TEMPORARY RESTRAINING ORDER

Plaintiffs iFinex Inc. ("iFinex"), BFXNA Inc. ("BFXNA"), and BFXWW Inc. ("BFXWW") (collectively, "Bitfinex"), and Tether Limited ("Tether") (collectively, "plaintiffs"), hereby apply, pursuant to Federal Rule of Civil Procedure 65 and Local Rule 65-1, for a Temporary Restraining Order ("TRO") and Order to Show Cause ("OSC") why a preliminary injunction should not issue enjoining defendants Wells Fargo & Company and Wells Fargo Bank, N.A. (collectively, "Wells Fargo") and each of its agents, employees, and/or representatives, and any and all persons or entities acting under its direction or control, from suspending, rejecting, or refusing to process wire transfers of U.S. dollars from plaintiffs' correspondent accounts, without further order of the Court or plaintiffs' written consent.

This application is made on the grounds that plaintiffs are likely to succeed on the merits of their claims against Wells Fargo, plaintiffs will suffer irreparable injury if the requested injunctive relief is not granted, the balance of hardships favor plaintiffs, the requested injunctive relief is consistent with the public interest, and the requested injunctive relief will protect the *status quo ante* prior to Wells Fargo's unilateral actions.

The relief sought by this application is pursued on an *ex parte* basis rather than through a regularly-noticed motion because plaintiffs will suffer irreparable harm each day Wells Fargo refuses to process wire transfers from plaintiffs' correspondent accounts to plaintiffs' customers. A regularly-noticed motion would not provide plaintiffs with the necessary relief because plaintiffs will not be able to meet their contractual commitments to their customers as of April 5, 2017, well before the end of the notice period for a regularly-noticed motion.

*Ex Parte* Notice. Plaintiffs gave notice of this *ex parte* application to Wells Fargo by telephone to its counsel of record, David C. Powell, Esq., on April 5, 2017. Plaintiffs intend to provide Wells Fargo's counsel with a copy of plaintiffs' Complaint and these *ex parte* papers once they are filed. (Declaration of Michael J. Baratz (" Baratz Decl.") ¶¶ 20, 23.)

STEPTOE & JOHNSON LLP
1891 Page Mill Road, Suite 200
Palo Alto, CA 94304

<u>Wells Fargo's Counsel's Contact Information</u>.  Wells Fargo's counsel's contact information is:

> David C. Powell, Esq.
> McGuire Woods LLP
> Two Embarcadero Center, Suite 1300
> San Francisco, CA 94111-3821
> Telephone:  (415) 844-1970

This application is based upon the attached Memorandum of Points and Authorities, the declarations of J.L. van der Velde and Michael J. Baratz and attached exhibits, the Proposed Order submitted herewith, and any additional evidence and arguments as may be presented at or before any hearing on this matter.

Respectfully submitted,

Dated: April 5, 2017                                      STEPTOE & JOHNSON LLP


By: */s/ Laurie Edelstein*
    Laurie Edelstein
    Michael Baratz (*pro hac* application submitted concurrently)
    Seth R. Sias

*Attorneys for Plaintiffs iFinex Inc., BFXNA Inc., BFXXWW Inc., and Tether Limited*

---

*EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER      No. 17 Civ. 1882
AND ORDER TO SHOW CAUSE WHY PRELIM. INJ. SHOULD NOT ISSUE

# MEMORANDUM OF POINTS AND AUTHORITIES

Plaintiffs respectfully submit this memorandum of points and authorities in support of their application for a TRO and OSC to enjoin Wells Fargo from suspending, rejecting, or refusing to process wire transfers of U.S. dollars from plaintiffs' correspondent accounts, without further order of the Court or plaintiffs' written consent. Without a TRO, plaintiffs' businesses will be crippled, and they will suffer irreparable harm.

# INTRODUCTION

Until last week, Bitfinex and Tether, which operate digital currency platforms, freely transferred U.S. dollars to and from their customers through their Taiwan-based banks, which used Wells Fargo to process plaintiffs' U.S. dollar transactions. At the end of March, however, Wells Fargo, without notice or explanation to plaintiffs, decided to stop processing outgoing wire transfers in U.S. dollars from plaintiffs' accounts with their Taiwan-Based banks.[1] Wells Fargo's unilateral action will cause irreparable harm to plaintiffs because they will not be able to send to their customers U.S. dollars that belong to them, and plaintiffs will not be able to function as viable businesses. Plaintiffs' businesses will be crippled without a TRO enjoining Wells Fargo's suspension of wire transfers of U.S. dollars from plaintiffs' accounts.

# BACKGROUND

The accompanying Complaint details the facts. Plaintiff iFinex, through its subsidiaries, BFXNA and BFXWW, owns and operates a leading global Virtual Currency platform called Bitfinex. (Declaration of J.L. van der Velde ("van der Velde Decl.") ¶ 2.) Bitfinex provides a technology platform for customers (both business and individuals) to engage in the trade of Virtual Currency using U.S. dollars. (*Id.* ¶ 4.) Plaintiff Tether owns and operates a digital platform that allows customers to store, send, and make purchases with digital tokens called tethers. (*Id.* ¶¶ 5.) Tethers may be redeemed or exchanged for U.S. dollars on deposit. (*Id.* ¶ 6.) Currently, the only currency Bitfinex and Tether receive from or remit to their customers is the U.S. dollar. (*Id.* ¶ 27.)

---

[1] All capitalized terms have the same meaning as set forth in the Complaint.

Before using Bitfinex's or Tether's platforms, customers must enter into a contract with Bitfinex or Tether agreeing their terms of service, which are publicly available on plaintiffs' respective websites. (*Id*. ¶ 9.) Customers using U.S. dollars also must go through an extensive due diligence process. (*Id.* ¶ 10.) Plaintiffs also have in place standards to monitor transactions, assess risks, and file Suspicious Activity Reports (SARs) and other reports required by U.S. law. (*Id.* ¶ 11.)

Customers who want to purchase Virtual Currency through Bitfinex must deposit U.S. dollars or tethers into their Bitfinex account. (*Id.* ¶ 12.) In exchange, they receive an equivalent amount of Virtual Currency until they ask Bitfinex to remit back the U.S. dollars they deposited. (*Id.*) Likewise, customers who want to purchase tethers through Tether must deposit U.S. dollars in their Tether account and in exchange receive an equivalent amount of tethers until they ask Tether to remit back the U.S. dollars they deposited. (*Id.*) For these platforms to work, customers depend on plaintiffs' ability to send back in U.S. dollars the money customers deposited with plaintiffs. (*Id.* ¶ 14.) This concept is similar to a customer of a U.S. financial institution having access to her money from a branch, on demand, and 24/7 through an ATM. (*Id.* ¶ 15.) Currently, Bitfinex has Virtual Currency equal to approximately $430 million USD and customer deposits in banks in Taiwan equal to approximately $130 million USD. (*Id.* ¶ 13.) Tether currently has approximately $50 million USD in banks in Taiwan. (*Id.*)

Plaintiffs hold or have held customers' deposits at Taiwan-Based Banks, which conduct business on their behalf pursuant to correspondent bank agreements that the Taiwan-Based Banks have with U.S. financial institutions, such as Wells Fargo. (*Id.* ¶¶ 16-17.) Plaintiffs, however, are not direct customers of the U.S. banks. (*Id.* ¶ 18.) Wells Fargo is a correspondent bank to the Taiwan-Based Banks. (*Id.* ¶ 19.) Plaintiffs rely on these Taiwan-Based Banks to make and receive wire transfers with and through Wells Fargo to obtain and transmit value for their customers in USD, *e.g.*, to fulfill customers' demands to remit their U.S. dollars deposited with plaintiffs, settle accounts, and for plaintiffs to pay its employees and suppliers, including some of Wells Fargo's own customers. (*Id.* ¶ 20.)

STEPTOE & JOHNSON LLP
1891 Page Mill Road, Suite 200
Palo Alto, CA 94304

Plaintiffs believe and understand that for more than two years, the Taiwan-Based Banks have conducted both ingoing and outgoing wire transfers in U.S. dollars with Wells Fargo on accounts for Bitfinex and Tether. (van der Velde Decl. ¶ 25; Compl. ¶ 37.) Wells Fargo, as part of its due diligence process with these Taiwan-Based Banks, knew or should have known they were conducting transfers from accounts held by plaintiffs that involved wire transfers to receive or remit U.S. dollars for the purpose of providing customers with the means to purchase Virtual Currency or tethers. (van der Velde Decl. ¶ 25; Compl. ¶ 38.)

Plaintiffs believe and understand that during the latter half of March 2017, Wells Fargo informed the Taiwan-Based Banks that it would no longer service outgoing wire transfers from plaintiffs' correspondent accounts that plaintiffs rely on to fulfill requests to remit U.S. dollars to customers, without further due diligence concerning these accounts. (*Id.* ¶ 39.) Taishin was the last of the Taiwan-Based Banks processing wires for and on behalf of the plaintiffs through Wells Fargo. (*Id.* ¶ 41.) On Friday, March 31, 2017, near the close of business in Taiwan, Taishin confirmed to Bitfinex that Wells Fargo would no longer process plaintiffs' outgoing wires as a correspondent bank for Taishin. (*Id.*) Wells Fargo, however, has continued to process incoming wires to plaintiffs' accounts through the Taiwan-Based Banks without interruption or delay. (van der Velde Decl. ¶ 24.)

Prior to suspending the processing of plaintiffs' outgoing wires through the Taiwan-Based Banks, Wells Fargo did not provide any explanation as to why it will no longer process them. (*Id.* ¶ 30.) Plaintiffs received no inquiry or request for information. (*Id.* ¶ 31.) If any request had been made, plaintiffs would have fully cooperated and responded to same. (*Id.*) Plaintiffs have a long history of responding timely to requests for information. (*Id.*)

Plaintiffs have made repeated attempts to resolve this issue without Court intervention but they have been unsuccessful. (Declaration of Michael J. Baratz ("Baratz Decl.") ¶ 4.) They have sought clarifying information directly from Wells Fargo, but Wells Fargo has refused to speak with plaintiffs claiming it will speak only to its customers, the Taiwan-Based Banks, despite knowing that these banks were closed during the holiday. (*Id.* ¶¶ 5-13.) On April 4,

1    2017 at 12:00 p.m. Eastern Time, plaintiffs' attorneys sent another e-mail to Wells Fargo,
2    informing it that they would pursue relief in court if Wells Fargo did not respond.  (*Id.* ¶ 14.)
3    However, plaintiffs' attorneys offered to continue communicating with Wells Fargo and its
4    attorneys and to present Wells Fargo with information about plaintiffs in an attempt to find an
5    immediate short-term arrangement to resume the processing of wire transfers.  (*Id.*)  This
6    morning, April 5, 2017, plaintiffs' attorneys finally spoke with outside counsel for Wells Fargo
7    and explained the issue.  (*Id. ¶* 20.)  Wells Fargo's outside counsel said he would communicate
8    with Wells Fargo and provide a response this morning, Pacific Time.  Plaintiffs' attorneys
9    reiterated plaintiffs' preference to work out a short-term arrangement to allow wire transfers to
10   continue being processed without Court intervention, but indicated they remained ready and
11   willing to seek the instant temporary restraining order if necessary.  (*Id*.)

12   After consulting with his client, Wells Fargo's counsel confirmed at 11:53 a.m. that
13   Wells Fargo had instructed the Taiwan-Based Banks that Wells Fargo would not accept any
14   more outgoing wire transfers from plaintiffs' accounts.  (*Id.* ¶ 21.)  He explained that Wells
15   Fargo will not service wires that relate to Virtual Currency.  (*Id*.)  Wells Fargo's counsel also
16   informed plaintiffs that Wells Fargo is not interested in meeting with plaintiffs or exploring any
17   additional due diligence.  (*Id*.)  Wells Fargo has been aware of plaintiffs' business for years and
18   has known, or should be aware, that its decision to suspend outgoing wire transfers from
19   plaintiffs' correspondent account to plaintiffs' customers will cripple plaintiffs' businesses and
20   render them unable to function as of Wednesday, April 5, 2017.  (van der Velde ¶ 25; Compl.
21   ¶¶ 53-54.)

## LEGAL STANDARD

23   The standard for the issuance of a temporary restraining order or a preliminary injunction
24   is the same.  *See Imperial* v. *Castruita*, 418 F. Supp. 2d 1174, 1177 (C.D. Cal. 2006).  The
25   applicant must demonstrate:  "(1) a strong likelihood of success on the merits, (2) the possibility
26   of irreparable injury to plaintiff if preliminary relief is not granted, (3) a balance of hardships
27   favoring the plaintiff, and (4) advancement of the public interest."  *Rodde* v. *Bonta*, 357 F.3d

STEPTOE & JOHNSON LLP
1891 Page Mill Road, Suite 200
Palo Alto, CA 94304

988, 994 (9th Cir. 2004) (internal quotations and citation omitted). Alternatively, injunctive relief may be granted if a plaintiff demonstrates either "a combination of probable success on the merits and the possibility of irreparable injury *or* that serious questions are raised and the balance of hardships tips sharply in [its] favor." *Id.* (internal quotations and citation omitted). These two alternatives "represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases. They are not separate tests but rather outer reaches of a single continuum." *Imperial*, 418 F. Supp. 2d at 1177.

## ARGUMENT

### I. PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT IMMEDIATE INJUNCTIVE RELIEF

To establish irreparable harm, a plaintiff need show only a significant threat, not a certainty or likelihood, of injury. *Arcamuzi* v. *Continental Air Lines, Inc.,* 819 F.2d 935, 937 (9th Cir. 1989). Courts recognize that because certain intangible harms to a plaintiff's business are not easily quantifiable, they are irreparable. *Rent-A-Center* v. *Canyon Television & Appliance*, 944 F.2d 597, 603 (9th Cir. 1991) (threat of damage to recruiting efforts and goodwill constituted an incalculable costs and thus irreparable harm); *see also Ross-Simons of Warwick, Inc.* v. *Baccarat, Inc*., 102 F.3d 12, 20 n.7 (1st Cir. 1996) (because harm to goodwill could be incalculable, it was irreparable).[2]

Here, plaintiffs face a threat of overwhelming and irreparable harm if Wells Fargo is not enjoined to restore the *status quo ante* and continue processing plaintiffs' lawful outgoing wire transfers from their correspondent bank accounts. Absent this injunctive relief, plaintiffs' business relationships and ongoing operations will experience a major – if not fatal – interruption. This interruption almost certainly will undermine plaintiffs' reputation and

---

[2] Courts in other jurisdictions also recognize that injury to business reputation causes irreparable harm. *See Int'l Casings Group, Inc.* v. *Premium Standard Farms, Inc*., 358 F. Supp. 2d 863, 876 (W.D. Mo. 2005) (possible damage to the plaintiff's reputation and goodwill constituted an irreparable harm); *see also Merrill Lynch, Pierce, Fenner & Smith, Inc.* v. *Salvano*, 999 F.2d 211, 215 (7th Cir. 1993) (potential loss of clients constituted an irreparable harm); *EMI Latin* v. *Bautista*, No. 03 Civ. 0947, 2003 WL 470333 at *14 (S.D.N.Y. Feb. 24, 2003) (possible loss to plaintiff's goodwill and business relationships with its customers amounted to an irreparable harm).

STEPTOE & JOHNSON LLP
1891 Page Mill Road, Suite 200
Palo Alto, CA 94304

customer goodwill, resulting in the loss of both current and prospective customers.  Plaintiffs believe that if they are unable to send timely to their customers the U.S. dollars that belong to them, the customers will view the failure as plaintiffs' own wrongdoing or inability to provide the U.S. dollars and turn to plaintiffs' competitors, some of which have lower due diligence standards than plaintiffs.  (van der Velde Decl. ¶¶ 24-29.)  These damages to plaintiffs' business interests and contractual relationships are not merely economic; they are intangible injuries that defy calculation and are thus irreparable.

Wells Fargo's actions leave plaintiffs with no adequate remedy at law.  The risk of reputational harm to plaintiffs' standing as trusted and diligence-oriented digital currency platforms is great.  Because this kind of damage to a company's standing in a market is precisely the sort of harm that is impossible to quantify, courts recognize that such an erosion of reputational standing is sufficient to show irreparable harm.  *See Ticor Title Ins. Co.* v. *Cohen*, 173 F.3d 63, 68 (2d Cir. 1999) (citing *Cavanaugh* v. *Looney*, 248 U.S. 453, 456 (1919)) ("An injunction should be granted when the intervention of a court of equity is essential to protect a party's property rights against injuries that would otherwise be irremediable.").  The Court should issue a temporary restraining order to stop this immediate and irreparable harm.

## II. PLAINTIFFS WILL LIKELY PREVAIL ON THE MERITS OF THEIR CLAIM THAT WELLS FARGO TORTIOUSLY INTERFERED WITH THEIR CONTRACTUAL RELATIONSHIPS WITH THEIR CUSTOMERS

To obtain injunctive relief, a plaintiff need not show that its likelihood of prevailing is "absolutely certain."  *Cty. of Alameda* v. *Weinberger*, 520 F.2d 344, 349 n.12 (9th Cir. 1975). Rather, a plaintiff need only show "a fair chance of success on the merits."  *San Antonio Cmty. Hosp.* v. *S. Cal. Dist. Council of Carpenters*, 125 F.3d 1230, 1234 (9th Cir. 1997).  Plaintiff readily meets this standard.  To sustain an action for intentional interference with contractual relations, a plaintiff must establish (1) the existence of a valid contract between plaintiff and a third party; (2) defendant's knowledge of the contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of

the contractual relationship; and (5) resulting damage. *See Pac. Gas & Elec. Co.* v. *Bear Stearns & Co.*, 791 P.2d 587, 589-90 (Cal. 1990).

The first two elements are easily met. Plaintiffs' provision of digital currency services to their customers is governed by contracts that are publicly available on plaintiffs' websites. (*See* van der Velde Decl. ¶ 9.) As part of its due diligence process with the Taiwan-Based Banks, Wells Fargo knew, or should have known, that the Taiwan-Based Banks were conducting wire transfers from accounts held by plaintiffs. (Compl. ¶ 38.) Wells Fargo also knew, or should have known, that the nature of plaintiffs' business involved wire transfers to receive or remit U.S. dollars for the purpose of providing customers with the means to purchase Virtual Currency or tethers. (*Id.*) In addition, Wells Fargo regularly processed outgoing wire transfers to and for the benefit of plaintiffs and their customers through the same correspondent accounts currently suspended for outgoing transfers, and Wells Fargo has continued to process incoming wire transfers on these same correspondent accounts. (van der Decl. ¶¶ 24-25.) Given these facts, plaintiffs will be able to establish that Wells Fargo had knowledge of plaintiffs' contracts with its customers. *See Bank of N.Y.* v. *Fremont Gen. Corp.*, 523 F.3d 902, 910-11 (9th Cir. 2008) (finding knowledge of contract where defendant indemnity company was responsible for managing funds deposited into custodial account pursuant to contract between plaintiff and third party).

As for Well Fargo's intent to disrupt plaintiffs' contractual relations, under California law, direct evidence of intent to interfere is not required; intent "may be established by inference as well as by direct proof." *Bank of N.Y.*, 523 F.3d at 911 (quoting *Savage* v. *Pac. Gas & Elec. Co.*, 26 Cal. Rptr. 2d 305, 314 (Cal. Ct. App. 1993) (internal citation omitted)). A defendant may be found to have acted with intent to induce a breach or disruption of a contractual relationship based solely on facts showing defendant had "knowledge that the interference was certain or substantially certain to occur as a result of his or her action." *Reeves* v. *Hanlon*, 95 P.3d 513, 517 (Cal. 2004) ("[P]laintiff need not prove that a defendant acted with the primary purpose of disrupting the contract."). Wells Fargo's abrupt refusal to process outgoing wires for

plaintiffs' correspondent accounts provides both direct and indirect evidence of Wells Fargo's intent to cause a breach or disruption in plaintiffs' contractual relations with their customers.

Wells Fargo was aware of the nature of plaintiffs' businesses, including their need for Wells Fargo to process incoming wire transfers from plaintiffs' customers to make deposits in exchange for Virtual Currency or tethers and to transmit outgoing wire transfers to remit U.S. dollars to plaintiffs' customers. (van der Velde Decl. ¶ 25.) Interestingly, without explanation, Wells Fargo has continued to accept incoming wire transfers, at least nine in total, to plaintiffs' correspondent accounts since March 31, 2017, suggesting Wells Fargo recognizes the legitimacy of plaintiffs' business dealings and is helping them facilitate part of their commitment to customers. (*Id.* ¶ 24.) Wells Fargo also should understand the significant effect its decision will have on plaintiffs' ability to meet its obligations to its worldwide customers. Regardless of any independent purpose and desire Wells Fargo may assert regarding its suspension of processing the wire transfers, Wells Fargo still acted with "intent" within the meaning of this tort because it knew the resulting disruptions to plaintiffs' contractual relations would be a necessary consequence. *See Quelimane Co. v. Stewart Title Guar. Co.*, 960 P.2d 513, 531 (Cal. 1998) (citing Restatement (Second) of Torts § 766 (1979)).

As to the final elements of intentional interference with contractual relations – actual breach or disruption and damage – California courts use the broad "substantial factor" test. *See Bank of N.Y.*, 523 F.3d at 909 (citing *Franklin* v. *Dynamic Details, Inc.,* 10 Cal. Rptr. 3d 429, 441 (2004) ("California employs the 'substantial factor' test for determining causation in intentional torts cases.")); *see also Bear Stearns & Co.*, 791 P.2d at 592 592 (recognizing that "interference with the plaintiff's performance may give rise to a claim for interference with contractual relations [even absent an actual or inevitable breach] if plaintiff's performance is made more costly or more burdensome"). Applying this test, Wells Fargo's action very likely will be found to have caused serious disruptions to plaintiffs' contractual relationships with its customers and their ability to pay their employees and suppliers. (*See* van der Velde Decl. ¶¶ 20, 27-29 .)

STEPTOE & JOHNSON LLP
1891 Page Mill Road, Suite 200
Palo Alto, CA 94304

Wells Fargo was fully aware of the nature of plaintiffs' business, including their need for Wells Fargo to transmit outgoing wire transfers to fulfill plaintiffs' customers' requests for the U.S. dollars they had deposited with plaintiffs. (van der Velde ¶ 25, Compl. ¶ 38.) There can be little dispute that Wells Fargo knew, or should have known, that its decision was substantially certain to result in disruption of plaintiffs' contractual relationships, just as the inability of debit and credit card users to obtain cash from ATMs would disrupt relationships between a bank and its customers. (van der Velde ¶ 15.) In addition, by continuing to accept and process incoming wire transfers while suspending plaintiffs' outgoing wire transfers, Wells Fargo is placing plaintiffs in the tenuous position of accepting customers' funds without being able to process efficiently outgoing requests. (*Id.* ¶¶ 27-28.) Wells Fargo's decision almost certainly will cause customers to become alarmed that plaintiffs are not able to remit funds customers deposited with plaintiffs or that plaintiffs are otherwise implicated in some wrongdoing. (*Id.* ¶ 29.) If Wells Fargo had not made its decision to suspend outgoing wire transfers, plaintiffs' business would have continued as usual.

## III. THE BALANCE OF HARDSHIPS WEIGHS HEAVILY IN PLAINTIFFS' FAVOR

The irreparable injury plaintiffs will suffer absent injunctive relief, including substantial disruption to its ability to serve their customers and immeasurable reputational harm, clearly outweighs any possible hardship Wells Fargo might suffer by continuing to serve as a correspondent bank for plaintiffs' lawful remittance of U.S. dollars to and from their customers through their Taiwan-Based Banks. (*Id.* ¶¶ 27-29.) Issuance of injunctive relief will restore the *status quo ante*, allowing plaintiffs to continue to meet their obligations to their customers while the Court has an opportunity to adjudicate the merits of plaintiffs' claims. *See Chalk* v. *United States Dist. Ct.*, 840 F.2d 701, 704 (9th Cir. 1988) (observing that preservation of the status quo is the basic function of an interim injunction).

By contrast, there appears to be no risk of harm to Wells Fargo, which until just two weeks ago regularly conducted business with the Taiwan-Based Banks on plaintiffs' behalf without any known injury or basis for liability. To the extent Wells Fargo has any concerns

1 about processing wires from plaintiffs' correspondent accounts, plaintiffs repeatedly have made
2 themselves available to provide any information necessary to alleviate any concerns Wells Fargo
3 may have about these transactions. (*See* van der Velde Decl. ¶¶ 31-32.)

## IV. INJUNCTIVE RELIEF SERVES THE PUBLIC INTEREST

The public interest is an important factor to be considered in the balancing of hardships. *See Dep't of Parks and Rec. of the State of Cal.* v. *Bazaar del Mundo, Inc.*, 448 F.3d 1118, 1124 (9th Cir. 2006). Critically, the law recognizes the need to protect plaintiffs' contractual relations with and obligations to their clients. *See Quelimane*, 960 P.2d at 530, *as modified* (Sept. 23, 1998) ("[T]he exchange of promises which cements an economic relationship as a contract is worthy of protection from a stranger to the contract.").

By unilaterally cutting off plaintiffs' ability to transact business in U.S. dollars without warning, Wells Fargo's action likely will cripple plaintiffs' businesses and threaten participant confidence in the global digital currency markets.

## CONCLUSION

For the foregoing reasons, the Court should enter an order temporarily restraining and enjoying Wells Fargo from suspending wire transfers of U.S. dollars from plaintiffs' correspondent accounts, without further order of the Court or plaintiffs' written consent.

Respectfully submitted,

Dated: April 5, 2017　　　　　　　　　　　　STEPTOE & JOHNSON LLP

By: */s/ Laurie Edelstein*
　　Laurie Edelstein
　　Michael Baratz (*pro hac vice*
　　application submitted concurrently)
　　Seth R. Sias

　　*Attorneys for Plaintiffs iFinex Inc.,
　　BFXNA Inc., BFXWW Inc., and
　　Tether Ltd.*