1  Laurie Edelstein (Bar No. 164466)
   Seth R. Sias (Bar No. 260674)
2  STEPTOE & JOHNSON LLP
   1891 Page Mill Road, Suite 200
3  Palo Alto, California 94304
   Telephone: (650) 687-9500
4  Facsimile: (650) 687-9499
   ledelstein@steptoe.com
5  ssias@steptoe.com

6  Michael Baratz (application for *pro hac vice*
   admission submitted concurrently)
7  STEPTOE & JOHNSON LLP
   1330 Connecticut Avenue, NW
8  Washington, DC 20036
   Telephone: (202) 429-3000
9  Facsimile: (202) 429-3902
   mbaratz@steptoe.com

11 *Attorneys for Plaintiffs iFinex Inc., BFXNA Inc, BFXWW Inc., and Tether Limited*

**STEPTOE & JOHNSON LLP**
**1891 Page Mill Road, Suite 200**
**Palo Alto, CA 94304**

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| iFINEX INC., BFXNA INC., BFXWW INC., and TETHER LIMITED, <br><br> Plaintiffs, <br><br> v. <br><br> WELLS FARGO & COMPANY and WELLS FARGO BANK, N.A., <br><br> Defendants. | No. 17 Civ. 1882 <br><br> **DECLARATION OF J.L. VAN DER VELDE IN SUPPORT OF *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY PRELIMINARY INJUNCTION SHOULD NOT ISSUE** |

# DECLARATION OF J.L. VAN DER VELDE

I, J.L. van der Velde, hereby declare as follows:

1. I am the Chief Executive Officer for iFinex Inc. ("iFinex"), BFXNA Inc. ("BFXNA"), BFXWW Inc. ("BFXWW"), and Tether Limited ("Tether"). I have personal knowledge of the facts set forth below, and if called and sworn as a witness, I could and would testify competently thereto.

2. iFinex, through its subsidiaries BFXNA and BFXWW, owns and operates a leading global Virtual Currency platform called Bitfinex.[1]

3. iFinex, BFXNA, BFXWW, and Tether Limited ("Tether") are the plaintiffs in this action.

4. Bitfinex provides a digital platform for customers (both business and individuals) to engage in the trade of Virtual Currency using U.S. dollars and other Virtual Currencies.

5. Tether is a financial technology company that operates a platform to store, send, and make purchases with a form of digital currency – digital tokens called tethers – that are fully backed by U.S. dollars on deposit from customers.

6. Tethers may be redeemed or exchanged for the underlying U.S. dollars.

7. Virtual Currency can be stored or spent in a "digital wallet," which allows users to send, receive, or transfer Virtual Currency.

8. Participants in the digital currency economy must first obtain Virtual Currency from a third party, which is often done through a digital currency platform such as Bitfinex.

9. Before using the Bitfinex or Tether platforms, customers must enter into a contract with Bitfinex or Tether, agreeing to their terms of service, which are publicly available on plaintiffs' respective websites at https://www.bitfinex.com/terms and https://tether.to/legal/. (*See* Exs. 1 and 2 attached hereto.)

10. Customers using U.S. dollars also must subject themselves to extensive due diligence procedures.

---

[1] All capitalized terms have the same meaning as set forth in the Complaint.

STEPTOE & JOHNSON LLP
1891 Page Mill Road, Suite 200
Palo Alto, CA 94304

11. Plaintiffs also have in place standards to monitor transactions, assess risks, and file Suspicious Activity Reports (SARs) and other reports required by U.S. law.

12. Customers who want to purchase Virtual Currency through Bitfinex must deposit U.S. dollars or tethers into their Bitfinex account and in exchange receive an equivalent amount of Virtual Currency until they ask Bitfinex to remit back the U.S. dollars they deposited. Likewise, customers who want to purchase tethers through Tether must deposit U.S. dollars in their Tether account and in exchange receive an equivalent amount of tethers until they ask Tether to remit back the U.S. dollars they deposited.

13. Currently, Bitfinex has Virtual Currency equal to approximately $430 million U.S. dollars and its customer deposits in banks in Taiwan equal to approximately $130 million U.S. dollars. Tether has $50 million in customer deposits in banks in Taiwan.

14. For these systems to work, customers depend on Bitfinex's and Tether's ability to send back to them the U.S. dollars they deposited with Bitfinex or Tether.

15. This concept is similar to a customer of a U.S. financial institution having access to her money from a branch, on demand, and 24/7 through an ATM, except that unlike U.S. financial institutions, plaintiffs must, and do, make available every dollar of customers' deposits, provided that correspondent banks process their transactions.

16. Plaintiffs hold or have held customers' deposits in accounts at one of four Taiwan-Based Banks: Hwatai Commercial Bank, KGI Bank, First Commercial Bank and Taishin Bank (collectively, the "Taiwan-Based Banks").

17. Upon information and belief, these Taiwan-Based Banks conduct business on plaintiffs' behalf pursuant to correspondent bank agreements that the Taiwan-based banks have with U.S. financial institutions, such as defendants Wells Fargo & Company and Wells Fargo Bank, N.A.

18. However, plaintiffs are not direct customers of the U.S. banks.

19. Wells Fargo is a correspondent bank to the Taiwan-Based Banks.

20. Plaintiffs rely on the Taiwan-Based Banks to make and receive wire transfers with and through correspondent banks to obtain and transmit value for their customers in U.S. dollars, *e.g.*, to fulfill customers' demands to convert virtual currency back into U.S. dollars, settle accounts, and for plaintiffs to pay their employees and suppliers, including some of Wells Fargo's own customers.

21. Upon information and belief, for more than two years, the Taiwan-Based Banks have conducted both ingoing and outgoing wire transfers in U.S. dollars with and through Wells Fargo on accounts listing Bitfinex and Tether and their customers as beneficiaries.

22. Upon information and belief, throughout the latter half of March 2017, Wells Fargo informed the Taiwan-Based Banks that it would no longer service outgoing wire transfers on plaintiffs' correspondent accounts that plaintiffs rely on to fulfill requests to remit U.S. dollars to customers, without further due diligence concerning these accounts.

23. Taishin was the last of the Taiwan-Based Banks processing wires for and on behalf of the plaintiffs through Wells Fargo. On Friday, March 31, 2017, near the close of business in Taiwan, Taishin confirmed to Bitfinex that Wells Fargo would no longer process the plaintiffs' wires as a correspondent bank for Taishin Bank.

24. Crucially, this decision has affected only outgoing wire transfers. Without explanation, Wells Fargo has continued to process incoming wire transfers, at least nine since March 31, 2017, to plaintiffs' correspondent accounts.

25. Based on my understanding of bank due diligence processes, I would be very surprised to learn that Wells Fargo was not aware of the nature of plaintiffs' businesses for years and that it has processed outgoing wire transfers with plaintiffs' Taiwan-Based Banks prior to late-March 2017.

26. Wells Fargo's conduct will cause irreparable harm to plaintiffs by substantially interfering with their ability to process efficiently requests from customers of their U.S. dollars deposited with plaintiffs, in much the same way that Wells Fargo itself would be irreparably

STEPTOE & JOHNSON LLP
1891 Page Mill Road, Suite 200
Palo Alto, CA 94304

harmed if a third party precluded it from dispensing cash to customers at local bank branches or ATMS.

27. Indeed, because the only money received from and sent to customers is U.S. dollars, Wells Fargo's decision will completely cripple plaintiffs' ability to process worldwide customers' requests to transfer U.S. dollars that belong to them, and will bring plaintiffs' business to a standstill.

28. Plaintiffs' inability to transfer U.S. dollars to their customers almost certainly will undermine plaintiffs' reputation and customer goodwill, resulting in the loss of both current and prospective customers.

29. If plaintiffs are not able to send timely to their customers the U.S. dollars that belong to them, I believe customers will view the failure as plaintiffs' own wrongdoing or inability to provide the requested currency and they will turn to plaintiffs' competitors, some of which have lower due diligence standards than plaintiffs.

30. Wells Fargo has not provided any explanation to plaintiffs as to why it will no longer process plaintiffs' outgoing wires through the Taiwan-Based Banks.

31. Plaintiffs have received no inquiry or request for information in respect of the actions taken by Wells Fargo in March 2017. If any request had been made, plaintiffs would have fully cooperated and responded to same. Plaintiffs have a long history of responding timely to requests for information from the Taiwan-Based Banks and, indirectly, from any correspondent banks.

32. Plaintiffs have repeatedly made themselves available to Wells Fargo to provide any information necessary to alleviate any concerns Wells Fargo may have about the transactions. But Wells Fargo has refused to speak directly with plaintiffs.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 5 day of April, 2017.

DATED: April 5, 2017

_____
J.L. van der Velde